## LUTERMAN et al. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. May 26, 1922.;

No. 2833.

1. **Criminal law ⊝37—Acts of secret service agent held not to constitute entrapment.**

That a secret service agent, presenting himself as a customer, contracted to purchase counterfeit internal revenue stamps then in possession of defendants, did not constitute an entrapment, which would defeat a prosecution for conspiracy to commit an offense and for buying, receiving, and keeping in their possession such stamps, with intent to defraud, acts which necessarily preceded their attempted sale.

2. **Criminal law ⊝1171(1)—Improper remarks of counsel not ground of reversal, unless prejudicial.**

A defendant will be guarded from prejudice arising from irrelevant and inflammatory remarks of prosecuting counsel, and in applying this principle in an appellate court the first inquiry is whether such remarks were prejudicial, and, second, if so, whether the prejudice was cured by the action of court or counsel.

3. **Criminal law ⊝729—Prejudice which might have resulted from remarks of district attorney held obviated by prompt withdrawal.**

Where, on objection to remarks of a district attorney which went beyond the evidence, he explicitly withdrew them before the jury, stating what the evidence showed, and restating his argument within proper limits, any prejudice which might have resulted from such remarks *held* cured.

In Error to the District Court of the United States for the Western District of Pennsylvania; Joseph Buffington, Judge.

Criminal prosecution by the United States against John Luterman and others. Judgment of conviction, and defendants bring error. Affirmed.

Edmund K. Trent, of Pittsburgh, Pa., and Joseph P. Tumulty and Charles H. Baker, both of Washington, D. C., for plaintiffs in error.

Walter Lyon, U. S. Atty., and Felix B. Snowden, Asst. U. S. Atty., both of Pittsburgh, Pa.

Before WOOLLEY and DAVIS, Circuit Judges, and MORRIS, District Judge.

WOOLLEY, Circuit Judge. By the indictment, James Laux, Thomas McCollum, Isadore Glans, Jake Gold, Max Golden, William Dickerman, John Luterman and D. M. Luterman were charged with violating sections 148, 151, 157 and 37 of the Criminal Code (Comp. St. §§ 10318, 10321, 10327, 10201). The seven counts, framed in the terms of the statutes, were in substance as follows:

By the first and second counts all defendants were charged, in different terms, with forging and counterfeiting a large number of Internal Revenue adhesive strip stamps of the kind used by the Federal Government under the provisions of the Act of Congress of March 3, 1897 (Comp. St. §§ 6070–6077), in the bottling of distilled spirits in bond. The forged stamps resemble lawful stamps in shape, color, engraving and wording. A specimen stamp contains these words:

"State of Kentucky, Old Charter Distillery Co., Distillers. Fall 1920, Spring 1915. One Quart. Proof 100. Bottled in bond under the supervision of the United States Government in Distillery Bonded Warehouse. Tax Paid."

By the third, fourth, fifth and sixth counts the defendants were charged with using and having in their possession forged and counterfeited strip stamps of the kind described; with passing or attempting to pass them; with buying and receiving them; and with selling or attempting to sell them, with intent to defraud the United States and divers persons. By the seventh count the defendants were charged with conspiring to commit several of the offences enumerated. Section 37 of the Criminal Code.

To this indictment Laux pleaded guilty. The remaining defendants submitted to trial. At the trial the government withdrew the first and second counts and the jury by their verdict convicted McCollum, Glans, John Luterman and D. M. Luterman on all the remaining counts and acquitted Gold, Golden and Dickerman. McCollum entered upon his sentence. Glans, John Luterman and D. M. Luterman sued out this writ of error.

Before discussing the assignments of error it will be necessary first to understand the character of the court's instructions on the law; and second, to state the facts which were submitted for decision on the law as charged. The learned trial judge, reciting the several counts and the applicable provisions of the Criminal Code, concluded with the count for conspiracy. He instructed the jury that:

"If you find there was no conspiracy and you dispose of that, I may say to you that I do not see how there would be anything for you to consider in reference to the other third, fourth, fifth and sixth counts, because unless you find there was a conspiracy and an intent, and that these things were fraudulent, there is no basis for any conviction on the third, fourth, fifth and sixth counts of the indictment. But if you find that conspiracy did exist and was attempted to be perpetrated there, then you go on to find whether these different men had any part in that conspiracy that is embraced in the seventh count of the indictment, and you take up the case," etc.

Thus it appears the court made the charge of conspiracy in the seventh count the basis of conviction on the remaining four counts. It became the principal issue submitted to the jury. Conspiracy being the foundation of the transaction as charged by the court, the jury in acquitting some of the defendants and convicting others on all counts evidently pursued an instruction so favorable to the defendants that they cannot be heard to complain of the submission. This being the law of the case, the central facts are these:

James Tierney, secret service agent in charge of the United States Secret Service for the Western District of Pennsylvania, detailed Walter R. Thayer, another secret service agent, to conduct an investigation in Pittsburgh with reference to the sale and distribution of forged and counterfeited revenue stamps of the kind used in bottling spirits in bond. Thayer obtained an introduction to McCollum, one of the defendants, and entered into negotiations with him for the purchase of forged stamps. McCollum, stating that the stamps could be procured from his partner, introduced Thayer to Laux. Following a brief con-

versation, the three men entered a taxicab. After driving some distance, Laux left the cab and McCollum and Thayer proceeded to the home of Dickerman, where Glans appeared and inquired of Thayer the number of stamps he desired. Glans then went with McCollum and Thayer to a garage managed by the two Lutermans. Glans introduced Thayer to Dave Luterman. A discussion took place between them as to the number of stamps to be purchased. Dave Luterman offered to sell and Thayer agreed to buy 300 dozen at $6.75 a dozen. Arrangements were made for the delivery of the stamps at the garage that night. At the appointed time Thayer met McCollum and Laux down town and the three men drove to the Luterman garage. Dave Luterman and Max Golden were in the office upstairs. After Laux had telephoned to Glans, John Luterman came into the office and engaged Thayer in conversation, inquiring where he came from and how long he had been in the bootlegging business. Glans came to the garage and the men talked about Thayer, one or more being suspicious of him. Finally Laux directed Glans to tell McCollum and Thayer to go to the corner of the street, about two hundred feet from the garage, and wait for the stamps. Laux followed them and disclosed to Thayer the suspicion the others had of him. Apparently satisfying him, Thayer inquired where they kept the stamps and was told that they kept them in the safe at the garage. Thereupon Thayer said he would not hand over his $2,000 until he saw the stamps. Laux returned to the garage and got some stamps and brought them to Thayer for his inspection. Suspicion being allayed, Laux gave McCollum a signal that the coast was clear and then went back to the garage, from whence again he returned telling Thayer that an automobile would presently appear and that he was to get into it and the stamps would be delivered to him when the automobile was being driven up the street. Directly the automobile arrived, driven by Golden and with Gold sitting on the front seat. Laux opened the door, McCollum jumped in and Thayer, disclosing his identity, covered the men with his revolver and arrested them. Secret Service Agents Tierney and Beary had been shadowing Thayer throughout the transaction and being nearby came to his assistance. The counterfeit stamps were found in the car. The men were taken to the Federal Building and held.

These are the bald facts of the Government's case. We have omitted much incriminating conversation.

At the trial the only motions for a directed verdict of acquittal were made on behalf of Dickerman and Golden. On the motion for a new trial, however, error was charged to the court for submitting to the jury the question of the guilt of D. M. Luterman on any count of the indictment upon the ground that there was no evidence connecting him with the possession of the stamps or with the criminal agreement with reference to them. Although a question of error of this character cannot be raised on writ of error without an exception to an appropriate motion made at the trial, and of course cannot be based on the court's refusal of a motion for a new trial, we have, nevertheless, considered the whole record with reference to the sufficiency of the evidence to sustain the conviction of D. M. Luterman and of his codefendants as

well. Without discussing the evidence, it is enough to say that it sustains the verdict as to all defendants found guilty.

The remaining specifications of error are addressed to the refusal by the court to charge certain points, and to its refusal to withdraw a juror and continue the case and thereafter to arrest the judgment because of certain conceived fundamental prejudices arising during the trial.

[1] Without deciding whether the matters complained of are properly raised on this writ of error, we have, nevertheless, given them our attention. The first is the ground for the motion in arrest of judgment, to the effect:

"That the evidence produced by the Government in support of the said indictment, shows that the defendants had been entrapped into the commission of what the jury found to be a crime, by a Government official, one Thayer."

The law on this question is not open to dispute. Clearly it is against public policy to sustain a conviction for an offense where officers of the law have incited and induced its commission. Andrews v. United States, 162 U. S. 420, 423, 16 Sup. Ct. 798, 40 L. Ed. 1023; Sam Yick v. United States, 240 Fed. 60, 153 C. C. A. 96; Woo Wai v. United States, 223 Fed. 412, 137 C. C. A. 604; United States v. Echols (D. C.) 253 Fed. 862; Commonwealth v. Wasson, 42 Pa. Super. Ct. 38; Butts v. United States (C. C. A.) 273 Fed. 35, 38; 16 Corpus Juris, 88. That the secret service agent in this case incited or induced the defendants to commit crime can scarcely be true when we consider the crimes for which they were indicted and tried. These were principally the crime of conspiring to commit an offense against the United States, and the crimes of buying, receiving and keeping in their possession forged or counterfeited obligations of the United States with intent to defraud. Manifestly, the secret service agent neither incited nor induced the commission of any one of these offenses. While unquestionably he led the defendants into an attempt to dispose of the stamps unlawfully in their possession, he did not lure them into the commission of crimes which, from their very nature, preceded that act. A distinction is readily to be drawn between inducing a person to commit a crime and luring him to disclose a crime which he has already committed. As the jury by their verdict found four defendants guilty on all counts of the indictment (except the first and second), including particularly the count of conspiracy, we are of opinion that the trial court did not commit error in pronouncing sentence on the counts on which the verdict was found.

At the conclusion of the charge counsel for the defendants asked the court to read to the jury their third, fourth and fifth points. These were:

"3. It is not safe for the jury to convict any defendant upon the uncorroborated testimony of accomplices.

"4. Two accomplices cannot be considered by the jury as corroborating each other.

"5. In this case the testimony of the Government's witness Thayer cannot be deemed to be corroborated by the testimony of the self-confessed accomplice Laux."

The trial judge read these points to the jury, and feeling that he had sufficiently covered them in the charge and being aware that the conduct of the defendants fitted in with the words attributed to them by Laux and Thayer, added to the instruction he had already given on the law of accomplices, and not excepted to, these words:

"I understand that those three points refer to the testimony of Laux and Thayer, and they are treated as accomplices in the commission of this alleged crime, and I understand it was so argued to the jury. If you believe that Thayer and Laux were accomplices in the commission of this crime, and united to do it, and that they are self-confessed, I don't think you ought to pay any attention to their testimony."

This liberal instruction left with the jury the question whether Thayer and Laux were accomplices, the only tribunal by which that question could be decided. Laux admittedly was an accomplice with the other defendants. There is no evidence that Thayer was an accomplice of the defendants. There is little, if any, evidence upon which the jury could have found that Laux and Thayer were accomplices one with the other. Certainly the defendants cannot complain of the instruction, for it might, under the authorities, have been framed greatly to their disadvantage. 1 Wharton's Criminal Evidence, § 440; 1 Greenleaf on Evidence, § 382; Campbell v. Commonwealth, 84 Pa. 187; Richardson v. United States, 181 Fed. 1, 104 C. C. A. 69; Diggs v. United States, 220 Fed. 545, 136 C. C. A. 147, certiorari granted 238 U. S. 636, 637, 35 Sup. Ct. 940, 59 L. Ed. 1500, affirmed 242 U. S. 470, 37 Sup. Ct. 192, 61 L. Ed. 442, L. R. A. 1917L, 502, Ann. Cas. 1917B, 1168. The jury, however, have found by their verdict that Laux and Thayer were not accomplices, and that ends the matter.

The next and indeed the most important matter assigned as error, raised on a timely exception, has to do with remarks made by the District Attorney in the course of his argument to the jury. These remarks, it is insistently urged, were wholly without support in the evidence and were highly prejudicial. What transpired was this:

In addressing the jury the District Attorney said:

"The fair name of the Government is involved in cases of this kind, your Government and mine, the United States of America. The name of the United States of America was going to be, at some stage of the game, of which we are only seeing the beginning here—the name of our country was going to be put on something bogus, either plain well water as one extreme, or wood alcohol or poison as the other extreme."

At this point counsel for the defendants interrupted the District Attorney and addressing the court said:

"The defendants move the Court to withdraw a juror and continue the case, for the reason that the District Attorney has remarked that the stamps in this case were to be put on something bogus, either well water or wood alcohol, there being no evidence in the case what the purpose, if any, in connection with the stamps, was; and the Court is requested to withdraw a juror on the ground of highly prejudicial and improper argument."

In response, the court said:
"Proceed."

The District Attorney then turned to the court, saying:

"I will say to Mr. Trent (counsel for the defendants) and to the jury that I made no such statement as that. My statement was not that these stamps were going to be used, but I was asking the theoretical question, what might these stamps be used for in the game that was started here."

The court stated to counsel:

"You have made your several statements. The motion is refused, and an exception noted to defendants."

If the record had stopped here there might be a question whether the defendants were prejudiced by the remarks of the District Attorney and whether, accordingly, error was involved in the court's refusal of the defendants' motion to withdraw a juror. This question would have turned upon the relevancy of the remarks to the facts of the case and upon the law applicable in such a situation. Touching briefly on the remarks as they stand, unaffected by what followed, we may say that although there is nothing in the record indicating the contents of the bottles on which the counterfeited stamps were to be used, there is in the record evidence which shows that at least one of the defendants regarded Thayer as a bootlegger and, indeed, inquired of him how long he had been engaged in the bootlegging business. Although counterfeited Internal Revenue strip stamps might be used for the sole purpose of evading the revenue laws in disposing of pure liquor, it is equally clear that their purchase, possession, sale and use may be a business intimately related to that of bootlegging and, when sold to and used by bootleggers, counterfeited stamps will be used on bottles containing the kind of liquor, ranging from one extreme to the other, which bootleggers are known to deal in. Even standing alone it can readily be argued that the remarks of the District Attorney were within the latitude permissible to counsel in drawing inferences from the evidence.

[2] Coming to the law, we find it to be an established principle that courts will guard a party from prejudice arising from irrelevant and inflammatory remarks of opposing counsel. In applying this principle at the point of reversal on appeal, the law looks beyond the objectionable remarks. Its first inquiry is, of course, whether they were prejudicial; and its next is, if prejudicial whether the prejudice was cured by the action of the court or counsel. The conduct of counsel complaining of prejudice from remarks of his adversary usually takes one of several directions: That a juror be withdrawn and the case continued; or that counsel making the objectionable remarks shall withdraw them; or that the trial judge shall admonish the jury to disregard them. Upon these several moves of counsel and the manner in which they are responded to depends error. The presence of error in such a situation was well developed by Judge Lurton in Chadwick v. United States, 141 Fed. 225, 72 C. C. A. 343, where the District Attorney made remarks which were quite extreme in their inflammatory and objectionable character, yet the judge said:

"There is a degree of liberty allowable to counsel, whether for the government or the accused, in respect to the line of argument they shall pursue and

the inferences to be drawn from the evidence, which a trial judge should respect until the facts of the case are overstepped or arguments used which plainly abuse the privilege. [Judge Lurton then continued with a feature which runs through all the cases we have examined]. But to entitle the accused to a reversal when objection is made *and the language not withdrawn* it must appear that the matter objected to was plainly unwarranted and so improper as to be clearly injurious to the accused."

Prompt withdrawal of objectionable remarks is a factor entering into the question of prejudice, running as we have said through all the cases and illustrated again in Dunlop v. United States, 165 U. S. 486, 498, 17 Sup. Ct. 375, 379, 41 L. Ed. 799, where it was said:

"The court held that it [the language of the District Attorney] was improper, *and the District Attorney immediately withdrew it.* The action of the court was commendable in this particular, and we think this ruling, *and the immediate withdrawal of the remark* by the District Attorney, condoned his error in making it, if his remark could be deemed a prejudicial error. There is no doubt that, in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused. In such cases, however, if the court interfere, and *counsel promptly withdraw the remark*, the error will generally be deemed to be cured. If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation."

Sawyer v. United States, 202 U. S. 150, 26 Sup. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269, is another case in which the withdrawal of the remark was regarded as dispelling any prejudice arising from it.

In Diggs v. United States, 220 Fed. 545, 556, 136 C. C. A. 147, 158 affirmed 242 U. S. 470, 37 Sup. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168, the court stated the general rule to be that,

"Improper remarks in argument by the prosecuting attorney, although prejudicial, do not justify reversal, unless the court has been requested to instruct the jury to disregard them, and has refused to do so."

So also in the cases cited by the defendants withdrawal of the objectionable remarks is regarded as a factor in determining prejudice.

In Bullock v. C. & D. T. R. Co., 270 Pa. 295, 299, 113 Atl. 379, 380, confidently relied upon by the defendants, Mr. Justice Walling in the opinion, after referring to improper remarks of plaintiff's counsel in the argument, said:

"To this defendant made timely objection, and asked for the withdrawal of a juror. The request was refused and an exception sealed. The statements, however, *were neither withdrawn nor modified by counsel*, nor did the trial judge caution the jury to scrutinize or disregard them; so they impliedly had judicial sanction."

The judgment was reversed.

In Kelly v. Scranton Ry. Co., 270 Pa. 77, 112 Atl. 748, we again find withdrawal of the remarks regarded as a factor in determining whether prejudice was cured. Mr. Justice Simpson said:

"Counsel does and should have a wide latitude in urging a client's claim, and should not be held to the strict rules of propriety which are applied in considering a written pleading; but he ought to be swift, when his attention is called to the matter, *to withdraw any objectionable remarks* made by him in the heat of argument; and the trial judge should be at least equally

swift in instructing the jury to disregard them. * * * *If they had been withdrawn,* or the jury instructed to disregard them, *another question would have arisen;* though even this would not be sufficient to justify the refusal to withdraw a juror if the impropriety was gross."

Of course, the question of prejudice in any situation always is a matter for the court—the trial court primarily, the appellate court finally—but as stated in Johnston v. United States, 154 Fed. 445, 83 C. C. A. 299:

"It is usually within the discretion of the trial court to determine whether or not the limits of professional propriety have been exceeded. Ordinarily the exercise of that discretion will not be reviewed in an appellate court, unless the invective is so palpably improper that it may be seen to have been clearly injurious. State v. Brooks, 92 Mo. 542, 589, 5 S. W. 257, 330; State v. Calhoun, 72 Iowa, 432, 34 N. W. 194, 2 Am. St. Rep. 252; State v. Griffin, 87 Mo. 608, 615; People v. Perriman, 72 Mich. 184, 40 N. W. 425."

[3] Applying this law to the record, it is to be noted that counsel for the defendants did not ask the District Attorney to withdraw his remarks, or request the court to admonish the jury to disregard them. Counsel asked for the peremptory withdrawal of a juror and the continuance of the case. But immediately upon the ruling of the court against the defendants' motion, the District Attorney voluntarily withdrew his remarks in the following words:

"So that I may do no injustice to these defendants, gentlemen, I will say that there is no evidence in this case that they were engaged in the bottling of any kind of liquor. There is no evidence of that in the case, and please let no man of the jury go out under the impression that there is any evidence that these men were engaged in any other business than the counterfeit strip stamp business, and if I made a statement that they were engaged in any other business, that they were going to bottle something and put these strip stamps on wood alcohol or something else, *I retract it and withdraw it,* and I am stating as a matter of argument that we don't know what would be in the bottles that these were going on, because they are strip stamps and it is fair to argue that they were going to be put on bottles, because men who make these things don't do it to put them in their postcard albums. That is fair to argue. I do say that it is fair to argue that the people who would finally use them, would use them to trail in the dust the fair name of America, by putting them on bottles and guaranteeing that the liquid contained in those bottles was bottled under the supervision of the United States, that it was pure, that is a hundred per cent. pure, and if I do any injustice in that line of argument, I submit to you gentlemen that I have not."

As the District Attorney was swift to retract and withdraw the remarks which the defendants regarded as objectionable, we are of the opinion that if prejudice had flowed from them (which we greatly doubt) it was wholly cured by his action. But viewed in another light we are of opinion that the remarks were not so palpably improper as to have been clearly prejudicial and so improper as to justify this appellate court in finding that the trial court, in determining within the exercise of its discretion the limits of professional propriety, abused its discretion and committed error.

We have given full consideration to the several remaining matters urged as error, whether formally by the assignments or informally in the briefs. Neither within the specifications of error nor within the latitude we assume under our rule which enables us to notice plain er-

ror not assigned (Rule 11, 224 Fed. vii, 137 C. C. A. vii) do we find error in the trial and proceedings here on review. Therefore, we are constrained to direct that the judgment below be affirmed.